IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
DECEMBER 3, 2008 Session

**BEVERLY WALLER v. BRENDA EVANS**

**Direct Appeal from the Circuit Court for Davidson County**
**No. 06P-813     Randy Kennedy, Judge**

_____

**No. M2008-00312-COA-R3-CV - Filed March 17, 2009**

_____

In this appeal, we are asked to determine whether the decedent, Floyd Evans, Sr., possessed the requisite mental capacity to execute a power of attorney naming his brother as attorney-in-fact, which was subsequently used to change his life insurance and investment account beneficiary from his daughter to his wife. Additionally, we are asked to determine whether a confidential relationship existed between the decedent and his wife such that his wife exerted undue influence upon him in having his beneficiaries changed just prior to his death. We affirm the trial court, finding that the decedent possessed the requisite mental capacity and that the presumption of undue influence was rebutted through independent advice.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Larry B. Hoover, Nashville, TN, for Appellant

George J. Duzane, Dominic J. Leonardo, Nashville, TN, for Appellee

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Floyd Evans, Sr. ("Decedent") worked for Nashville Electric Service ("NES") for forty-one years prior to his death on April 12, 2006 at the age of sixty-three. Through NES, Decedent had both a life insurance policy and a 457 investment account.[1] In 1965, Decedent named his first wife as beneficiary of the life insurance policy, but he later changed the policy to reflect his second wife as beneficiary in 1977. In 1995, when he was unmarried, Decedent again changed the beneficiary of his life insurance policy to reflect his daughter, Beverly Waller ("Daughter"), as beneficiary. He also named Daughter as beneficiary of his 457 investment account in 2000.

In approximately 1998, Decedent's girlfriend, Brenda Evans ("Wife") and her daughter, who suffered from severe and complex disabilities, moved in with Decedent. On October 22, 2005, Decedent and Wife were married, one month after Decedent was diagnosed with lung and brain cancer. Four days later, on October 26, 2005, Decedent visited NES' benefit office and added Wife as the beneficiary of his survivor annuity. He also added his son, Floyd Evans, Jr., ("Floyd Jr."), as a contingent beneficiary of his life insurance policy, leaving Daughter as the primary beneficiary. When asked whether he wanted to make any changes to his 457 account, Decedent declined, stating that "they can get it when I die."[2]

On March 18, 2006, Decedent presumably received, in the mail, an employee benefits statement reflecting Daughter as the beneficiary of both the life insurance policy and the 457 investment account. Subsequently, on March 20, 2006, Wife telephoned NES to request a change of beneficiary form, which she claims was done at Decedent's request. The following day, after consulting with the NES legal department, NES employee Debra Pemberton informed Wife that either Decedent or someone with a power of attorney would have to come into the office to sign the form. Thereafter, from March 20, 2006 to March 30, 2006, NES received several phone calls from Wife and Decedent's brother, Lawrence Evans ("Lawrence"), requesting a change of beneficiary form. Each time an NES employee explained that a power of attorney was needed as the employees were unable to determine Decedent's competency.

Lawrence then contacted attorney Howard Skipworth ("Mr. Skipworth") to draft a power of attorney. According to both Mr. Skipworth and Lawrence, Mr. Skipworth met privately with Decedent in Decedent's home on April 4, 2006. On April 8, 2006, persons were assembled to witness the execution of both a Quitclaim Deed of Decedent's property to Wife and the General

---

[1] At Decedent's death, the life insurance policy was valued at $114,874.40 and the 457 investment account at $14,865.32.

[2] Only the life insurance policy and the 457 investment account are subject to this appeal. Furthermore, all parties have stipulated that as of October 26, 2005, Decedent had capacity and was not, at that particular time, operating under the influence of anyone.

Power of Attorney to Lawrence.[3]  Then, on April 12, 2006, two hours before Decedent's death, Lawrence visited the NES Benefit and Compensation Department with the power of attorney and executed documents naming Wife as the primary beneficiary of both Decedent's life insurance policy and his 457 investment account.

On May 23, 2006, Daughter filed a Complaint against Wife, Lawrence, and NES.  However, Daughter later non-suited Lawrence, and NES was dismissed after interpleading the funds at issue. After a bench trial, the trial court issued a Memorandum Opinion and Order on January 8, 2008, upholding the validity of both the quitclaim deed and the power of attorney.  Daughter appeals.

## II. ISSUES PRESENTED

Appellant has timely filed her notice of appeal and presents the following issues, slightly rephrased, for review:

1.      Did Decedent have the mental capacity to make an informed decision at the time of the execution of the Power of Attorney; and

2.      Did a confidential relationship exist between Decedent and Wife and did this confidential relationship lead to undue influence by Wife, causing Decedent to change beneficiaries just prior to his death.

For the following reasons, we affirm the decision of the probate court.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them.  Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).  For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).  "[T]his court gives great weight to findings of fact that require the trial court to resolve 'conflicts in the proof and to decide the weight to be given witness' testimony[,]" *In re Armster*, No. M2000-00776-COA-R3-CV, 2001 WL 1285904, at *7 (Tenn. Ct. App. Oct. 25, 2001) (quoting *Brewington v. Sanders*, No. 01A-01-9301-CV-00002, 1994 WL 189626, at *4 (Tenn. Ct. App. May 18, 1994)), as "[t]he trial court is in the best position to judge the credibility of the witnesses[.]" *Id.* (citations omitted).  Finally, we

---

[3] A Tennessee Statutory Durable Power of Attorney for Healthcare was also executed on April 8, 2006; however, its execution is not at issue in this appeal.

review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. Mental Capacity

On appeal, Appellant asserts that the chancery court erred in upholding the validity of the power of attorney, and thus, impliedly finding that Decedent possessed the requisite mental capacity. Appellant argues that "it is obvious that [Decedent's] mental capacities were such that he did not understand the consequences of the execution of th[e] power of attorney and therefore the power of attorney should be invalidated."[4]

"The mental capacity required to execute a power of attorney equates to the mental capacity required to enter into a contract." **Estate of Dooley v. Hickman**, No. E2005-02322-COA-R3-CV, 2006 WL 2482967, at *6 (Tenn. Ct. App. Aug. 29, 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co*, 78 S.W.3d 291, 297 n.1 (Tenn. Ct. App. 2001) (explaining that "to have an agency relationship under a power of attorney, the principal must have the capacity to contract"); *In re Armster*, 2001 WL 1285904, at *7). This Court has explained the mental capacity required to contract as follows:

> Competency to contract does not require an ability to act with judgment and discretion. All that is required is that the contracting party reasonably knew and understood the nature, extent, character, and effect of the transaction. Thus, persons will be excused from their contractual obligations on the ground of incompetency only when (1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or (2) when they are unable to act in a reasonable manner in relation to the transaction, and the other party has reason to know of their condition.
>
> All adults are presumed to be competent enough to enter into contracts. . . . It is not enough to prove that a person was depressed or had senile dementia. To prove mental incapacity, the person with the burden of proof must establish, in light of all surrounding facts and circumstances, that the cognitive impairment or disease rendered the contracting party incompetent to engage in the transaction at issue according to the standards set forth above.

---

[4] On appeal, Daughter does not address whether Decedent lacked the required mental capacity to execute the quitclaim deed; thus, we will not consider this issue.

*Id.* (quoting *Rawlings*, 78 S.W.3d at 297 (internal citations and footnotes omitted)). Furthermore, we have stated that "'[t]he extent or degree of intellect generally is not in issue, but merely the mental capacity to know the nature and terms of the contract.'" ***Ellison v. Ellison***, No. E2007-01744-COA-R3-CV, 2008 WL 4415768, at *7 (Tenn. Ct. App. Sept. 29, 2008) (citing *Roberts v. Roberts*, 827 S.W.2d 788, 792-92 (Tenn. Ct. App. 1991) (quoting 17 C.J.S. *Contracts* § 133(1)(e))). "Ultimately, contractual capacity is a question to be resolved on the facts of each case and the surrounding circumstances." ***Id.*** (citing *Roberts*, 827 S.W.2d at 792).

The party asserting a principal's lack of capacity as grounds for invalidating a power of attorney bears the burden of proof, and "'[that] proof must be clear, cogent, and convincing.'" ***Estate of Dooley***, 2006 WL 2482967, at *6 (quoting *In re Armster*, 2001 WL 1285904, at *8 (citations omitted)). The degree of mental capacity required to enter into a valid contract is a question of law; however, whether a party possessed such required degree is a question of fact. ***See Nashville, C. & St. L.R. Co. v. Brundige***, 84 S.W. 805, 805 (Tenn. 1905). Because the trial court made no express finding that Decedent possessed the required mental capacity to execute the power of attorney, we must "review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness." ***Boote v. Shivers***, 198 S.W.3d 732, 740 (Tenn. Ct. App. 2006) (citation omitted).

As we stated above, Decedent executed the power of attorney on April 8, 2006. The record includes Decedent's medical record from Alive Hospice Inc., which provides evidence concerning Decedent's mental capacity during that month. First, a Nursing Note dated April 5, 2006, lists Decedent as "semicomatose," "dependent," "very lethargic," and "drows[y]." However, it also states the Decedent "will wake briefly and converse appropriately." The following day, Hospice services were refused, but a Social Work Note lists Decedent as "in and out of drowsy condition." The record does not include any medical records made between April 7, 2006 and April 9, 2006. Instead, the next medical record comes from April 10, 2006, and describes Decedent as "forgetful," "confused," "dependent," "drows[y]," and "weak[]."

Many witnesses also testified before the trial court concerning Decedent's mental capacity. Mr. Skipworth, whose deposition was read at trial and is included in the record before us, testified about his meetings with Decedent on both April 4, 2006 and April 8, 2006. Mr. Skipworth explained that after receiving a visit from Lawrence informing him that his brother was dying and wanted to see a lawyer, he scheduled a visit with Decedent on April 4, 2006. After Decedent and Mr. Skipworth introduced themselves, Mr. Skipworth told Decedent that he "would speak to him and try to do [his] best to advise him on whatever he needed to do, or wanted to do." Decedent responded by saying, "I want to make sure that my wife stays in this house" and that "Lawrence, my brother, knows what I want done with the rest of the property." Mr. Skipworth testified that Decedent spoke clearly enough to be understood and stated that, to his knowledge, he was not under the influence of any mind-altering drugs. Mr. Skipworth stated that although Decedent was taking medication for his illness, "he understood what he was doing." Mr. Skipworth testified that before getting into the "legalese" with Decedent on April 4, 2006, he asked Decedent if he knew the names of the President of the United States, the mayor of Nashville, the governor of Tennessee, and all of

his children.  Decedent answered correctly to all.  Mr. Skipworth also asked Decedent to identify how many fingers Mr. Skipworth was holding up, which he answered correctly.

Mr. Skipworth also testified concerning April 8, 2006, the day the power of attorney was executed.  He stated that Decedent seemed "to be as alert, if not more alert" than when he met with Decedent four days prior.  He explained that when he arrived at Decedent's home on April 8, 2006, he walked into the kitchen and "[Decedent] was talking and [the people in the room] were joking with him, and he was carrying on a conversation with a couple of people."  He further testified that on April 8, 2006, he "went over the documents one by one" with Decedent, explaining "the legal ramifications of each one of them."  With respect to the power of attorney, Mr. Skipworth testified that he likely told Decedent:

> Mr. Evans, you know that I am Howard Skipworth, and I'm an attorney at law.  And you requested that I draft a document called a general durable power of attorney.  And that document, as I have explained to you in the past, is a very dangerous document.  That a person that has possession of this, that you've named as attorney in fact, can take this document, he or she can close out your checking account, they can sell your property, they can close out your checking account or savings account, take the money and go to Mexico.

After explaining the power of attorney, Decedent acknowledged that he understood the ramifications of executing such.  Although Mr. Skipworth admitted that at times during the execution process Decedent seemed to become bored and once had to be reminded to focus, Mr. Skipworth testified that "[i]f [he] had not felt [Decedent] was competent to execute [the documents], they would not have been executed."

Peggy Mathis, the Public Administrator, also provided testimony before the trial court related to Decedent's capacity at execution.  She testified that after Decedent's death when she went to Decedent's home to inventory his property, she stated to Wife, "I heard that you gave a shot to your husband to wake him up [on April 8, 2006] and I really want to know what that is I could use [some]."  She claims Wife then replied "Oh no, it wasn't me it was my sister."  However, on cross-examination, Ms. Mathis acknowledged that she did not ask Wife to clarify; therefore, she could not be sure that "shot" did not merely refer to a "shot of cowboy coffee" which Decedent drank.

Some of Decedent's friends also testified as to Decedent's capacity.  Holmer Hunter, who worked with Decedent for over forty years, testified that when he visited Decedent on April 5, 2006, Decedent did not know him and was "out of his head."  Similarly, Allen Maxey, with whom Decedent had drank coffee at the Waffle House nearly every day for fifteen years, testified that the week before Decedent died, Decedent told him that he was planning to return to work the following week. Mr. Maxey also testified that he saw Decedent on April 8, 2006, April 9, 2006, and April 11, 2006, and each day he was "out of it."  However, Bob Miller, who had also known Decedent for fifteen years, testified that he visited Decedent almost every day from March 23, 2006 until

Decedent's death. He stated that there was never a time that Decedent did not recognize him, although he "would wake up for a minute and say [']Bob['] or something like that and go back out."

Decedent's family members also testified concerning Decedent's mental capacity. Floyd Jr. stated that on the morning of April 8, 2006 Decedent did not recognize him, and later that day when he saw him at the kitchen table Decedent was "slumped over and not responding to [any]thing." Floyd Jr. further stated that he had been told that Decedent had been given a shot "to get him alert because the lawyer wouldn't be able to do his job if [Decedent] wasn't alert." However Wife testified that on the date of execution, April 8, 2006, Decedent recognized her as well as Mr. Skipworth and both witnesses, Carroll Richardson and Linda Bess, and she denied any knowledge of Decedent receiving a shot to wake him up. She stated that during the last week of Decedent's life he was merely tired, not confused. Lawrence also testified that on April 8, 2006, despite being tired, Decedent appeared to recognize him, Mr. Skipworth, Wife, and Carroll Richardson. He further stated that to his knowledge no one gave Decedent a shot to wake him up. Likewise, Donna Goad, Wife's sister, testified that on April 8, 2006, Decedent was alert and recognized her, Mr. Skipworth, and the witnesses, Mr. Richardson and Ms. Bess. She denied giving Decedent a shot to wake him up and agreed that Decedent gave her no "reason whatsoever to lead [her] to believe [that Decedent] did not know what he was doing[.]"

Finally, the witnesses to the execution of the power of attorney testified. Carroll Richardson testified that on April 8, 2006, Decedent knew both him and Mr. Skipworth and seemed to understand the documents being executed. Although he acknowledged that, at times, while others were conversing, Decedent laid his head down and did not join in the conversation, Mr. Richardson stated that Decedent was able to carry on a conversation with him and was able to answer Mr. Skipworth's questions. Similarly, Linda Bess testified that at the execution Decedent recognized her and appeared to understand the documents he signed.

Based on the foregoing testimony, we find that Appellant failed to show by "clear, cogent, and convincing" proof that Decedent did not "reasonably kn[o]w and underst[and] the nature, extent, character, and effect" of executing the power of attorney. *See Estate of Dooley*, 2006 WL 2482967, at *6 (citations omitted). Thus, we find Decedent possessed the requisite mental capacity to execute the power of attorney.

## B. Undue Influence

On appeal, Daughter also claims that a confidential relationship existed between Wife and Decedent which led to the exertion of undue influence upon Decedent such that Decedent changed his beneficiaries just prior to his death.[5] Therefore, she asserts that the power of attorney and all subsequent actions affected by such should be invalidated.

---

[5] Daughter does not raise as an issue on appeal whether Decedent was unduly influenced into executing the quitclaim deed. Therefore we will not address this issue on appeal.

"The most common way of establishing the existence of undue influence is 'by proving the existence of suspicious circumstances warranting the conclusion that the [action] was not the [decedent's] free and independent act.'" *Estate of Hamilton v. Morris*, 67 S.W.3d 786, 792 (Tenn. Ct. App. 2001) (quoting *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989)). The most frequently used "suspicious" circumstances are: "(1) a confidential relationship between the testator and the beneficiary; (2) the testator's poor physical and mental condition; and (3) the beneficiary's involvement in the procurement of the will in question." *Id.* (citing *Mitchell*, 779 S.W.2d at 388). However, other suspicious circumstances are also recognized: "(1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator." *Id.* at 792-93 (citing *Mitchell*, 779 S.W.2d at 388).

Although there exists no prescribed number of suspicious circumstances which must be met in order to invalidate an action, "the doctrine of indue influence is applicable only where there is a confidential relationship[.]" *In re Estate of Brevard*, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006) (citing *Keasler v. Estate of Keasler*, 973 S.W.2d 213, 219 (Tenn. Ct. App. 1997); *Simmons v. Foster*, 622 S.W.2d 838, 840 (Tenn. Ct. App. 1981); *see also Moore v. Green*, No. M2000-03203-COA-R3-CV, 2004 WL 547008, at *5 (Tenn. Ct. App. Mar. 18, 2004); *Pendola v. Butler*, No. M2002-00131-COA-R3-CV, 2003 WL 21766257, at *5 (Tenn. Ct. App. July 31, 2003); *Parham v. Walker*, 568 S.W.2d 622, 624 (Tenn. Ct. App. 1978); 25 Am.Jur.2d *Duress and Undue Influence* § 31 (1996); 95 C.J.S. *Wills* § 351 (2001)). "Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is." *Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002) (citing *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974)). However, "[i]n general terms, it is any relationship that gives one person the ability to exercise dominion and control over another." *Id.* (citing *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 410 (Tenn. 2002); *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002); *Mitchell*, 779 S.W.2d at 389).

Confidential relationships come from two sources: "(1) 'legal confidential relationships' and (2) 'family and other relationships.'" *In re Estate of Brevard*, 213 S.W.3d at 302-03 (quoting *Matlock v. Simpson*, 902 S.W.2d 384, 385-86 (Tenn. 1995)). "A 'legal confidential relationship' is a 'fiduciary relationship . . . or any other relationship where the law prohibits gifts or dealing between the parties.'" *Id.* (quoting *Matlock*, 902 S.W.2d at 385-86). Fiduciary relationships are confidential *per se*, but do not "make out a *prima facie* claim of undue influence unless the contestant establishes an additional suspicious circumstance[.]" *Id.* (quoting *Kelley*, 96 S.W.3d at 197). However, family relationships are not confidential *per se* and thus, "the contestants must prove the elements of domination and control in order to establish the existence of a confidential relationship." *Id.* (quoting *Matlock*, 902 S.W.2d at 385-86). Proof of a family relationship "coupled with proof of domination and control" establishes a confidential relationship, "but does not make out a *prima facie* claim of undue influence unless an additional suspicious circumstance exists." *Id.* (citing *Kelley*, 96 S.W.3d at 197). Thus, the existence of a fiduciary relationship presumes a

confidential relationship, while a family relationship requires proof of "domination and control" to establish that a confidential relationship exists.

"The dominant rule in Tennessee and elsewhere is that the existence of a confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, [raises] a presumption of undue influence[.]"[6] **Matlock**, 902 S.W.2d at 386 (citing *Hogan v. Cooper*, 619 S.W.2d 516 (Tenn. 1981); *Richmond v. Christian*, 555 S.W.2d 105 (Tenn. 1977); *Estate of Depriest v. Allen*, 733 S.W.2d 74 (Tenn. Ct. App. 1986); *Brown v. Weik*, 725 S.W.2d 983 (Tenn. Ct. App. 1983); *Roberts v. Chase*, 166 S.W.2d 641 (Tenn. Ct. App. 1942); 19 A.L.R.3d 575, 596). However, this is not a conclusive presumption. **See Estate of Neely**, No. M2000-01144-COA-R3-CV, 2001 WL 1262598, at *5 (Tenn. Ct. App. Oct. 22, 2001). "It can be rebutted, but only by clear and convincing evidence of the fairness of the transaction." **Id.** (citing *Matlock*, 902 S.W.2d at 386). The receipt of independent advice, while not required, is one way to prove such fairness. **See Hogan**, 619 S.W.2d at 519, 520 (citations omitted). We may also "consider the totality of the evidence" to determine the fairness of the transaction. **See Gordon v. Thornton**, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979); *see also Taylor v. Taylor*, No. M2007-00565-COA-R3-CV, 2008 WL 1850807, at *4 (Tenn. Ct. App. Apr. 24, 2008) perm. app. denied (Oct. 17, 2008) ("The nature of proof of fairness necessary to overcome the presumption of undue influence is, of course, largely dependent on the particular facts of the case at issue.").

### 1. Confidential Relationship

Because undue influence can only be found where a confidential relationship exists, we must first determine whether Decedent and Wife were in a confidential relationship. As we noted above, the existence of a fiduciary relationship presumes a confidential relationship, while the finding of a confidential relationship based on familial ties requires the additional proof of "domination and control." **See In re Estate of Brevard**, 213 S.W.3d at 302-03 (citations omitted). Thus, to determine whether a confidential relationship existed, we must first determine whether a fiduciary or family relationship is involved.

A confidential relationship arises–through a fiduciary relationship–between a principal and attorney-in-fact to a power of attorney when the power of attorney has been exercised and the attorney-in-fact was active in its procurement. **See In re Conservatorship of Groves**, 109 S.W.3d 317, 351 (Tenn. Ct. App. 2003) (citing *Childress*, 74 S.W.3d at 329). Although a power of attorney was executed and exercised in this case, Lawrence, not Wife, was acting as the attorney-in-fact. Therefore, a fiduciary relationship did not exist between Decedent and Wife. However, a

---

[6] "'The presumption of undue influence extends to all dealings between persons in fiduciary and confidential relationships, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party.'" **Parish v. Kemp**, No. W2007-02207-COA-R3-CV, 2008 WL 5191291, at *4 (Tenn. Ct. App. Dec. 11, 2008) (citing Parish *v. Kemp*, 179 S.W.3d 524, 531 (Tenn. Ct. App. 2005) (quoting *Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979))).

confidential relationship can still be found if: 1) a family relationship existed and 2) Wife exercised dominion and control over Decedent.

      The party claiming the existence of the confidential relationship has the burden of proving such. **Brown v. Weik**, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983) (citing *In re Estate of Rhodes*, 436 S.W.2d 429, 435 (Tenn. 1968)). "'The question of whether a confidential relationship existed is a question of fact, and this Court gives great deference to the Trial Court's findings of fact.'" **Smith v. Smith**, 102 S.W.3d 648, 652 (Tenn. Ct. App. 2002) (quoting *Brantley v. Mayo*, No. 02-A01-9710-GS-00261, 1998 WL 900341, at *3 (Tenn. Ct. App. W.S. Dec. 28, 1998)). Wife's Brief to this Court states that "[t]he [t]rial [c]ourt did not err in finding a confidential relationship existed between [Decedent] and [Wife], but this confidential relationship did not lead to undue influence[.]" Although Wife's Brief suggests that the trial court found a confidential relationship, we do not believe the court so found.[7] Therefore, "we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness." **Boote**, 198 S.W.3d at 740 (Tenn. Ct. App. 2005) (citing *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997)).

      As Decedent and Wife were married, a family relationship obviously existed between the two. Likewise, we find that Wife was in a position of "domination and control" over Decedent, and therefore a confidential relationship existed between Decedent and Wife. As we noted above, the Alive Hospice Nursing Notes dated March 31, 2006, April 5, 2006, April 10, 2006, and April 12, 2006 all describe Decedent as "dependent" and two list him as "weak[]." Furthermore, witnesses testified as to Decedent's dependency. Bob Miller stated that Decedent needed constant care the last week of his life and Wife's sister, Donna Goad, testified that during the last three weeks of Decedent's life, "[Decedent] looked to [Wife] to take care of him when no one else was there[,]" and that "[Wife] did the most care." Wife helped Decedent bathe, helped him to the bathroom, cooked his meals, and dispensed his medication. Additionally, Wife testified that during those last three weeks she was with Decedent "essentially 24 hours a day 7 days a week[,]" although she claimed that Decedent was not "totally dependent" on her.

      As further evidence of Wife's "domination and control," the record reveals that Wife seemingly controlled access to Decedent. According to Mr. Hunter, he went to Decedent's house on April 7, 2006, but despite his "beat[ing] on the door" no one answered. Similarly, Daughter testified that when she telephoned Decedent during the last week of his life she was always told he was asleep although once she could hear Decedent talking in the background. She also claimed that she visited Decedent's home but no one answered the door. Finally, Wife was in a position to refuse Hospice services.

---

[7] The trial court's Memorandum Opinion and Order specifically found that "[t]he use of a power of attorney by Lawrence to transfer the life insurance benefit and the 457 account benefits to [Wife] was not the product of undue influence but was an extension of a free and voluntary act on the part of [Decedent] who consciously and independently authorized his brother Lawrence to accomplish goals which were conclusively and properly intended by [Decedent] to benefit [Wife], the person most beloved by [Decedent]." The trial court did not specifically address whether a confidential relationship existed between Decedent and Wife.

Based on the foregoing evidence, we find that Decedent was under Wife's dominion and control. *See In re Estate of Neely*, 2001 WL 1262598, at *4 (finding dominion and control where decedent relied on his daughter for his financial and physical needs, including dispensing medication, assisting his movement from a bed to a recliner, and either sitting with him or hiring a sitter). Thus, having found a confidential relationship, we must next determine whether such relationship led to undue influence being exerted upon Decedent by Wife.

2. Undue Influence

Whether a person exerted undue influence over another is a question of fact. *In re Estate of Price*, No. E2007-00523-COA-R3-CV, 2008 WL 762389, at *10 (Tenn. Ct. App. Mar. 24, 2008) perm. app. denied (Sept. 29, 2008) (citing *Gibson v. Gibson*, No. W2004-00005-COA-R3-CV, 2004 WL 2464271, at *3 (Tenn. Ct. App. Nov. 2, 2004)). Therefore, we must presume the correctness of the trial court's finding–that Decedent was not unduly influenced–unless the preponderance of the evidence is otherwise. **Tenn. R. App. P. 13(d)**.

"[T]he existence of a confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, [raises] a presumption of undue influence[.]" *Matlock*, 902 S.W.2d at 386 (citations omitted). Because we found that Decedent and Wife were in a family relationship wherein Wife was in a position of "domination and control" over Decedent, a confidential relationship existed. Likewise, we find that this confidential relationship, coupled with the execution of a power of attorney through which Wife ultimately became the beneficiary of Decedent's life insurance policy and 457 investment account, raises a presumption that the benefit was procured through undue influence. We find no requirement that Wife be a party to the document providing the benefit. Instead, we think that Wife ultimately benefitted is enough.

To overcome the presumption of undue influence, the fairness of the transaction must be proved by clear and convincing evidence. *In re Estate of Troutman*, No. E2007-01959-COA-R3-CV, 2008 WL 2521410, at *5 (Tenn. Ct. App. June 25, 2008) (citing *Matlock*, 902 S.W.2d at 386; *Gordon*, 584 S.W.2d at 658). The receipt of independent advice by the weaker party may prove such fairness. *Id.* However, proof of independent advice is not required as we may alternatively "consider the totality of the evidence" to determine whether the transaction was fair. *See Childress*, 2000 WL 1035952, at *3 (citing *Gordon*, 584 S.W.2d at 658). Our Supreme Court has defined adequate independent advice as follows:

> Proper independent advice in this connection means that the donor
> had the preliminary benefit of conferring fully and privately upon the
> subject of his intended gift with a person who was not only competent
> to inform him correctly as to its legal effect but who was furthermore
> so disassociated from the interests of the donee as to be in a position

-11-

to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefactions.

*Richmond v. Christian*, 555 S.W.2d 105, 109 (Tenn. 1977) (quoting *Turner v. Leathers,* 232 S.W.2d 269, 271 (Tenn.1950)).

The record contains considerable evidence regarding Decedent's interactions with Mr. Skipworth. First, Mr. Skipworth's deposition provides testimony concerning his initial contact with Decedent's family as well as his meetings with Decedent on April 4, 2006 and April 8, 2006. Mr. Skipworth testified that Lawrence visited his office and informed him that Decedent was dying and wanted to talk to an attorney. Therefore Mr. Skipworth telephoned Decedent a few days later and scheduled to meet with him. On April 4, 2008, Mr. Skipworth entered Decedent's home and was directed to his bedroom, where the two met privately with the bedroom door closed for, as Lawrence testified, approximately one hour. Mr. Skipworth told Decedent of Lawrence's visit to his office informing him that Decedent wanted to speak with an attorney. Mr. Skipworth then told Decedent that he "would speak to him and try to do [his] best to advise him on whatever he needed to do, or wanted to do." Mr. Skipworth testified that Decedent responded by saying "I want to make sure that my wife stays in this house" and that "Lawrence, my brother, knows what I want done with the rest of the property." After asking Decedent questions to determine his competency, Mr. Skipworth then suggested he draft a deed putting Wife's name on the property. Mr. Skipworth then discussed executing a power of attorney listing Lawrence as attorney-in-fact. Mr. Skipworth spoke specifically about what a power of attorney could do, and, as discussed above, Mr. Skipworth explained the dangers of such a document, pointing out that Lawrence could "take his money and go to Mexico." However, Floyd replied, "I trust my brother with my life, and he knows what I want done."

Regarding the date of execution, April 8, 2006, Mr. Skipworth testified that although he did not personally read the documents in their entireties, nor explain each paragraph, he reiterated to Decedent the dangers of executing a power of attorney. Decedent acknowledged that he understood the ramifications of executing such. Trial witnesses corroborated this testimony. Lawrence, Wife's sister, and Carroll Richardson each testified that Mr. Skipworth explained the documents to Decedent on April 8, 2006, before they were executed. Additionally, several witnesses testified that Mr. Skipworth remained at Decedent's home for one and a half hours to a "couple of hours" on the date of execution, therefore allowing ample time for such explanations to have occurred. Finally, Mr. Skipworth testified that he was not directed either by Wife or Lawrence as to what documents he should prepare for Decedent. In fact, he stated that he did not know Lawrence before he was contacted to consult with Decedent and he "never had a discussion with [Wife] concerning the[] documents."

We find the above testimony presents clear and convincing evidence of independent advice to Decedent in executing the power of attorney. Therefore, Wife has successfully rebutted the presumption of undue influence and the trial court's finding of no undue influence is affirmed.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the probate court. Costs of this appeal are taxed to Appellant, Beverly Waller, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.